UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

THEODORE W. SCHWEERS,

                    Plaintiff,

       - against -

NANCY A. BERRYHILL, ACTING
COMMISSIONER OF SOCIAL SECURITY,

                 Defendant.

---------------------------------------------------------------X

19 Civ. 6189 (RWL)

**DECISION AND ORDER:
SOCIAL SECURITY APPEAL**

**USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  9/14/2020**

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Theodore W. Schweers ("Schweers" or "Plaintiff"), represented by counsel, brings this action pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), seeking review of a determination of the Commissioner of Social Security ("Commissioner")[1] finding that Schweers is not entitled to disability insurance benefits ("DIB") under the Social Security Act ("Act") for the period of March 21, 2015, through December 31, 2016. Schweers and the Commissioner have cross-moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.[2] Because the Commissioner's

---

[1] As of June 17, 2019, the Commissioner of the Social Security Administration is Andrew Saul. "An action does not abate when a public officer who is a party in an official capacity . . . ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party." Fed. R. Civ. P. 25(d).

[2] Plaintiff's motion purports to be made as a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. 17, Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment on the Pleadings ("Pl. Mem."), at 3.) The motion, however, does not comply with the rules for filing a summary judgment motion in the Southern District of New York (for instance, there is no statement of material facts). *See* Local Civil Rule 56.1. Accordingly, the Court will consider the motion as one for judgment on the pleadings as is the traditional practice for resolving these types of cases.

decision erred, and for the reasons that follow, Plaintiff's motion is GRANTED, the Commissioner's motion is DENIED, and the case is REMANDED to the Commissioner for further consideration consistent with this decision.

## Background

### A.    Procedural History

Schweers applied for DIB in May 2015, alleging disability since March 21, 2015.  (R. 11.[3])  The Administration denied his application.  (R. 11.)  Represented by an attorney, Schweers testified by telephone at a hearing before an Administrative Law Judge ("ALJ") in September 2017.  (R. 11.)  In May 2018, the ALJ issued a decision finding that Plaintiff was not disabled between March 21, 2015, and December 31, 2016, the date when he was last insured.  (R. 11-21.)  That decision became final on May 13, 2019, when the Appeals Council denied Plaintiff's request for review.  (R. 1-4.)

Again represented by counsel, Schweers filed this action on July 2, 2019.  (Dkt. 1.[4])  On August 2, 2019, the parties consented to my jurisdiction for all purposes.  (Dkt. 11.)

### B.    Non-Medical Evidence

#### 1.    Plaintiff's Age, Education, and Job History

Schweers was born in May 1959 and was in his mid-fifties during the relevant time period.  (R. 19, 42.)  He graduated high school, earned a master's in plumbing, and previously worked as a plumber for more than 30 years.  (R. 45-49, 472-73.)  Although trained as a master plumber, he lost his license around 2013 or 2014 because he had not worked for two years.  (R. 44-45.)

---

[3] "R." refers to the official administrative record.  (Dkt. 12.)

[4] "Dkt." refers to the Court's official electronic case file docket.

### 2.      Plaintiff's Activities of Daily Living

Schweers lived alone, but his neighbor and friend helped him with cooking, cleaning, and laundry, and helped him shop every three weeks or so.  (R. 42-43, 56.)   In 2013, Schweers reported that he rarely went out of the house, usually just to shop for food at a grocery store two miles away, and very rarely drove a car.  (R. 592.)   In 2015, Schweers reported that he did light cooking three to four times a week, showered and dressed himself, cleaned once per week with help from a friend, did laundry twice a month by dropping it off and picking it up, shopped weekly with a friend's help, traveled by bus independently but needed to take anxiety medication if it was crowded, had friends, and watched television.  (R. 549, 557.)   At the 2017 hearing, Schweers testified that he last drove a car or took public transportation in 2015, and that his neighbor drove him to appointments and the grocery store.  (R. 43, 54.)   He said that reading gave him headaches and that he spent most of the day watching television.  (R. 58.)

### 3.      Plaintiff's Testimony and Alleged Impairments

Schweers asserted both physical and mental impairments.  He alleged disability due to major depression, panic attacks, anxiety, insomnia, migraines, diverticulitis, compromised immune system, and allergies to most antibiotics.  (R. 361-62, 471, 508-09.)   He reported that he had a history of diverticulitis that was treated with operations to remove part of his colon and intestine in 1993 and 1995, and that he still experienced a knife-like pain in his stomach when he was under stress.  (R. 592.)

Additionally, Schweers reported that in 2008 he was bitten by a spider on the back of his neck, which caused a MRSA infection that required three operations and multiple visits to

the hospital.[5]  (R. 49-50, 591.)  He was in the hospital for approximately two weeks and was out of work for approximately three months during his recovery with care from a visiting nurse.  (R. 591.)  Schweers reported that he had not been the same since his MRSA infection, was allergic to most antibiotics, was immune deficient and always getting sick, and developed depression, stress, and anxiety attacks.  (R. 50-51, 591.)  He said that he was unable to "put in a full day after [he] was infected by this," ran out of sick days, and was eventually laid off, which he believed was "because of all the time [he] had to take off."  (R. 49, 591.)  He looked for other employment but was unsuccessful, which he believed was "because of all the time I've had to take off."  (R. 592.)

Schweers testified that he had seen a psychiatrist since 2008, when he started to feel the effects of his infection.  (R. 51-52.)  He reported symptoms of stress, anxiety, acute depression, insomnia, social isolation, fear of crowds and leaving his home, claustrophobia, and short-term memory loss.  (R. 52-53.)  To address his symptoms, Schweers took alprazolam/Xanax and divalproex/Depakote, for which he reported side effects of fatigue, delusions, weight gain, and vision changes.  (R. 52, 56, 522.)

## C.    Vocational Expert's Testimony

At the September 2017 hearing, the ALJ obtained testimony from a vocational expert. (R. 59-65.)  When asked about a hypothetical person with Plaintiff's vocational profile who was limited to medium exertional work; had to avoid concentrated exposure to irritants such as fumes, odors, dust, and gases; needed a low stress job defined as having only occasional decision making required and only occasional changes in the work setting; and needed only occasional interaction with the public and coworkers, the vocational expert testified that such

---

[5] A MRSA infection is caused by a bacteria known as methicillin-resistant staphylococcus aureus.

a person could perform the unskilled, medium jobs of dining room attendant, kitchen helper, and stock handler.  (R. 60-61.)  The expert testified that a person who was absent from work two days per month, could work only four hours per day, or was off- task for 15 percent of the day would not be employable.  (R. 63.)

### D.    Medical Evidence

Schweers received treatment from providers at Montefiore Medical Center ("Montefiore"), where he saw his internist Dr. Claudine Smith and neurologist Dr. Sara Vollbracht, as well as gastroenterologist Dr. Michael Antony and psychiatrist Dr. Howard Isaacs.  (R. 363-64, 481-83, 604.)  Records showed relatively limited treatment during the relevant time period from March 2015 to December 2016 that was primarily focused on migraines and mental health symptoms.

In May 2015, Schweers saw Dr. Antony and reported no gastrointestinal or bowel complaints, but noted "severe and disabling psychiatric problems which include anxiety, depression, panic, anorexia and insomnia."  (R. 604.)  Dr. Antony advised Schweers to follow up with psychiatry and his primary care physician.  (R. 604.)

In June 2015, Schweers saw his primary care physician, Dr. Smith, for an annual exam and to establish care for multiple medical problems, his past medical history having included irritable bowel syndrome, diverticulitis of colon, hypertension, depression, and anxiety.  (R. 560.)  Schweers had "anxiety about not getting a job" and having "used up most of his retirement money," and on a depression questionnaire, he reported that he had little interest or pleasure in doing things and felt down, depressed, or hopeless more than half of the days.  (R. 560-61.)  However, Schweers had "[n]o acute medical problems," and a physical exam was normal.  (R. 560, 562.)  In August 2015, Schweers returned to Dr. Smith

to obtain referrals to an ophthalmologist because his vision was worsening and to a neurologist "because the psychiatrist who use[d] to treat him for migraine now wants him to see a neurologist."  (R. 569.)

The following year, in March 2016, Schweers saw Dr. Smith for a panic attack and headache.   (R. 581.)   Later in March, neurologist Dr. Vollbracht prescribed divalproex/Depakote to Schweers for his migraines but later advised him to take propranolol instead.  (R. 583, 587.)  In June 2016, Schweers saw Dr. Smith for hypertension, migraine without aura, and foot swelling (R. 574), and saw Dr. Vollbracht for management of his migraines (R. 601-02).  Dr. Vollbracht increased Schweers' propranolol and referred him for a sleep evaluation.  (R. 601.)

Schweers also regularly received treatment for depression and anxiety from his psychiatrist, Dr. Howard Isaacs, from 2010 to at least June 2015.  (R. 534-46.)  Dr. Isaacs produced handwritten notes that are not easily readable but showed that he prescibed antidepressants,  including  citalopram/Celexa  and  desvenlafaxine/Pristiq,  and  anti-anxiety medication, including alprazolam/Xanax.  (R. 535-46.)  Plaintiff reported that the medication had had no effect on him and that he had the same frequency and intensity of panic attacks (one to two per day), and that the only improvement in his depression had been improved appetite and weight gain.  (R. 537.)  In October 2014, Dr. Isaacs wrote "to clarify a point in my notes," that "[t]o my knowledge, he ha[d] not work[ed] for years, either at a regular job or side job," and that "[c]urrently he is not able to work."  (R. 590.)  The date of the last entry in the records produced by Dr. Isaacs is June 22, 2015.  (R. 546.)  There is no indication of what happened in the treatment relationship with Schweers from that point onward.

**E.**   **Consultative Examinations and Medical Source Statements**

The record contains medical source statements from three consulting doctors.  There is no medical source statement from any of Schweers' treating physicians.

**1.**   **Dr. Douglas Greenfield:  July 2015 Physical Consultative Examination**

In July 2015, Dr. Greenfield examined Schweers for an internal medicine examination. (R. 548.)  Schweers reported that he had been treated for diverticulitis in 1992 to 1993, and was treated at the hospital for MRSA in 2008.  (R. 548-49.)  He further reported being "bitten by a brown recluse spider on the back of the neck in 2008," which "caused a severe infection several weeks later;" he "underwent incision and drainage of an abscess" and had to change antibiotics "several times as this did not heal."  (R. 548.)  Schweers said he was admitted to the hospital, treated for MRSA, and "told that he was immune deficient and also has allergy to antibiotics containing sulfa."  (R. 548.)  Schweers also reported a history of hypertension since 2008, migraine headaches since 2009, and multiple psychological problems since his MRSA infection, including panic and anxiety attacks, acute depression, paranoia, insomnia, stress disorder, insecurity, claustrophobia, and fear of driving.  (R. 548-49.)  Schweers listed his current medications as alprazolam, divalproex, omeprazole, zolpidem, Tylenol, a multi-vitamin, and aspirin.  (R. 549.)

A physical exam was normal except for high blood pressure.  (R. 549-53.)  Schweers appeared in no acute distress, had normal gait and stance, used no assistive device, walked on heels and toes without difficulty, squatted full, needed no help changing for the exam or getting on and off the exam table, and was able to rise from a chair without difficulty.  (R. 550.)  His skin and lymph nodes were normal, his neck showed a scar from an incision to drain his abscess, his extremities were normal, his hand and finger dexterity was intact, his

grip strength was 5/5, his range of motion was full, and his reflexes, sensation, and strength were normal.  (R. 550-51.)  Dr. Greenfield diagnosed Schweers with status post MRSA abscess of neck with surgical drainage, hypertension, irritable bowel syndrome, migraine headaches, psychiatric complaints, and status post surgery for diverticulitis.  (R. 551.)  Dr. Greenfield opined that "[o]n the basis of this examination, the claimant has no restrictions." (R. 551.)

### 2.    Dr. Arlene Broska:  July 2015 Psychiatric Consultative Examination

The same day he saw Dr. Greenfield, Schweers saw Dr. Broska for a consultative psychiatric evaluation.  Schweers said that he had no psychiatric hospitalizations but he had seen a psychiatrist, Dr. Isaacs, once per month since 2008.  (R. 555.)  Schweers also reported that he went to the emergency room in June 2011 because he thought he was having a heart attack but was told it was anxiety.  (R. 555.)  He returned to the emergency room in May and July 2012 due to dehydration and anxiety.  (R. 555.)

Schweers reported getting bad headaches and said that he had panic attacks about twice each week where he felt discombobulated, nauseous, sweaty, dizzy, shaky, fearful he was dying, and had problems breathing.  (R. 556.)  He further reported problems sleeping and said his sleep medication did not work sufficiently, although he only took a half-dose.  (R. 555.)  Schweers stated that he had been feeling down every day and living off of his IRA, but he had no money left and would have to sell his house.  (R. 555.)  He denied suicidal ideation or a history of suicide attempts, but he worried he would lose his house if he did not get disability.  (R. 556.)

On a mental status examination, Schweers was cooperative and had adequate manner of relating, social skills, and overall presentation.  (R. 556.)  He had normal motor

behavior, posture, and eye contact.  (R. 556.)  His speech was fluent, his thought processes were coherent and goal directed, and he had full-range and appropriate affect, neutral mood, intact attention and concentration, normal memory, average intellectual functioning, good insight, and good judgment.  (R. 556-57.)

Dr. Broska diagnosed Schweers with panic disorder and depressive disorder and opined that the "results of the examination appear to be consistent with psychiatric problems, but in itself does not appear to be significant enough to interfere with the claimant's ability to function on a daily basis."  (R. 558.)  Dr. Broska opined that there was no evidence of limitation following simple directions, performing simple or complex tasks, maintaining attention and concentration, and "no evidence of limitation at the present time making appropriate decisions or relating adequately with others."  (R. 558.)  However, "[t]here is evidence for mild limitation maintaining a regular schedule" and "moderate limitation appropriately dealing with stress."  (R. 558.)

### 3.    Dr. T. Harding:  August 2015 Reviewing Psychologist

In August 2015, Dr. Harding reviewed the available records and, without examining Schweers, opined that Schweers "is capable of performing simple work, but would benefit from a low contact setting."  (R. 371.)  Dr. Harding assessed Schweers' functioning in a number of specific work-related areas, identifying no more than moderate limitations.  (R. 369-71.)

### F.    Submission of Additional Medical Records

On September 18, 2017 – eight days before the September 26, 2017 hearing – Schweers' counsel informed the ALJ of additional medical records that were shortly to be received.  Specifically, Schweers submitted a letter stating that they "were informed by M[

]ontefiore that these records were mailed to our office last week but we have still not received the required medical records." (R. 506.)  The letter asked the ALJ to "leave the record open for an additional thirty (30) days post-hearing for our office to receive the following evidence and submit to your office." (R. 506.)  On September 19, 2017, Schweers' counsel submitted a pre-hearing brief on behalf of Schweers and reiterated his request to keep the record open to receive evidence from Montefiore Medical Group from 2015 to 2017. (R. 510.)  The letter stated "[t]his evidence is imperative to Mr. Schweers pending claim for benefits and will further support treatment and limitations." (R. 510.)

## G.   The ALJ's Decision

In May 2018, the ALJ issued a decision finding that Schweers had failed to meet his burden of proof to show that he was disabled during the relevant time period from his alleged onset date in March 2015 and his date last insured in December 2016. (R. 11-21.)  At the outset of the decision, the ALJ acknowledged that he had been informed of the additional medical records from Monefiore but nevertheless did not admit them because they were late and Schweers' counsel "did not explain the need for these records or what they were expected to show." (R. 11.)  Additionally, the ALJ further declined to admit "outstanding records from Dr. Isaacs, which were submitted only a few days before the hearing" and about which Schweers' counsel purportedly had not informed him. (R. 11.)

The ALJ then went on to evaluate the case, following the requisite five-step sequential analysis (discussed further below).  At step one, the ALJ found that Schweers had not engaged in substantial gainful activity during the relevant period. (R. 13-14.)  At steps two and three, the ALJ found that Schweers had severe impairments of migraines, affective disorder, and anxiety disorder and non-severe impairments of asthma, diverticulosis,

gastroesophageal reflux disease ("GERD"), and hypertension, but that these impairments did not meet or equal a listed impairment that would require a disability determination. (R. 14-16.)

Prior to proceeding to step four, the ALJ found that Schweers retained the residual functional capacity ("RFC") to perform the full range of work at all exertional levels but with the following non-exertional limitations:  he should avoid concentrated exposure to irritants such as fumes, odors, dust, and gases; was limited to work in a low-stress job, which is defined as having only occasional decision-making required and only occasional changes in the work setting; and should have only occasional interaction with the public and co-workers. (R. 16.)  At steps four and five, based on this RFC and the testimony of the vocational expert, the ALJ found that Schweers was unable to perform his past relevant work as a plumber or plumber supervisor but could perform the medium, unskilled jobs of dining room attendant, kitchen helper, and stock handler.  (R. 19-20.)  The ALJ therefore concluded that Plaintiff was not disabled between March 2015 and December 2016.  (R. 20-21.)

In arriving at his determination of Schweers' RFC, the ALJ concluded that Schweers' description of the intensity, persistence, and limiting effects of his symptoms was not entirely consistent with the evidence in the record.  (R. 16-18.)  The ALJ also assigned different weights to the opinions of the three consulting doctors.   He gave the opinion of Dr. Greenfield, the physical consultative examiner, "considerable weight;" those of Dr. Broska, the psychological consultative examiner, "significant weight;" and those of Dr. Harding, the psychological consultant who reviewed the record, "great weight."   In contrast, the ALJ assigned "little weight" to the opinion of Dr. Isaacs, Schweers treating pscyhiatrist, who stated in one of his treatment notes that Schweers was unable to work.  (R. 18-19.)

**H.      Medical Records Submitted to the Appeals Council**

In support of his appeal to the Appeals Council, Schweers submitted additional records from Montefiore Medical Group, for the periods of September 8, 2017, through October 11, 2017; and May 30, 2018, through January 9, 2019.  (R. 2.)  These records showed that Schweers continued to make similar complaints as he did during the relevant time period, including that he had a "2008 episode with MRSA resulting in severe neck infection, subsequently developed allergies to 'all antibiotics,'" that he had "[r]esidual weakness and a number of psychological problems as a result[ ] (depression, anxiety etc)," that "his retirement account was one of those that Bernie Madoff made out with [sic]," that his "[f]ather and fiancee both died from br[ai]n cancer in recent years," and that he "now has no income – relinquished two life insurance plans and applied for Medicaid."  (R. 190.)

Schweers reported that he was claustrophobic, had lots of phobias, was on Xanax, and was isolated but had some friends and family.  (R. 192.)  However, physical exams were generally normal, and mental status exams generally showed that Schweers was alert and cooperative, with normal mood and affect, and normal attention span and concentration.  (R. 71, 109-10, 138, 193-94.)  In 2018, Schweers was diagnosed with a ventral hernia, and he experienced episodes of fecal and urinary incontinence and urgency.  (R. 99, 107-15, 130.)  In October 2018, Schweers' new internist, Dr. Kai Pittman, submitted a letter stating that Schweers was unable to work and had diagnoses that included diverticulosis, irritable bowel, panic attacks, depression, insomnia, GERD, history of a MRSA infection, vision changes, and chronic migraine without aura with intractable migraine, essential hypertension, closed fracture of multiple ribs of the left side with routine healing, seizures, memory loss, diverticulosis, agoraphobia, and foot swelling.  (R. 150.)  Schweers also wrote on the letter

that he had a "compromised immune system" and was "aller[g]ic to 90% of anti-biotics (due

over medication while I had MRSA)."  (R. 150.)

The Appeals Council determined that these records were irrelevant to the disability

determination because they post-date the relevant time period, which ended in December

2016.  (R. 2.)

**Applicable Law**

**A.      Standard of Review**

A United States District Court may affirm, modify, or reverse (with or without

remand) a final decision of the Commissioner of Social Security.  42 U.S.C. § 405(g);

*Skrodzki v. Commissioner of Social Security, Administration*, 693 F. App'x 29, 29 (2d

Cir. 2017) (summary order).  The inquiry is "whether the correct legal standards were

applied and whether substantial evidence supports the decision."  *Butts v. Barnhart*, 388

F.3d 377, 384 (2d Cir. 2004); *see also Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir.

2012) (same).

"Failure to apply the correct legal standard constitutes reversible error, including,

in certain circumstances, failure to adhere to the applicable regulations."  *Douglass v.

Astrue*, 496 F. App'x 154, 156 (2d Cir. 2012) (summary order) (quoting *Kohler v. Astrue*,

546 F.3d 260, 265 (2d Cir. 2008) (remanding for noncompliance with regulation, which

resulted in incomplete factual findings)).  Courts review de novo whether the correct

legal principles were applied and whether the legal conclusions made by the ALJ were

based on those principles.  *See Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)

(reversing where the court could not "ascertain whether [the ALJ] applied the correct

legal principles . . . in assessing [the plaintiff's] eligibility for disability benefits"); *Townley*

*v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (reversing where the Commissioner's decision "was not in conformity with the regulations promulgated under the Social Security Act"); *Thomas v. Astrue*, 674 F. Supp. 2d 507, 520 (S.D.N.Y. 2009) (reversing for legal error after de novo consideration).

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision." *Brault v. Social Security Administration, Commissioner*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)).  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Richardson v. Perales*, 402 U.S. 398, 401 (1971)); *see also Biestek v. Berryhill*, __ U.S. __, __, 139 S. Ct. 1148, 1154 (2019) (reaffirming same standard).  "The substantial evidence standard means once an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would have to conclude otherwise."  *Brault*, 683 F.3d at 448 (internal quotation marks and citation omitted); *see also* 42 U.S.C. § 405(g) ("findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive").

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record."  42 U.S.C. § 423(d)(5)(B).  The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which [the decision] is based."  42 U.S.C. § 405(b)(1).  While the

ALJ's decision need not "mention[ ] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability.  *See Ericksson v. Commissioner of Social Security*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler*, 546 F.3d at 268-69 (overlooking and mischaracterizing evidence); *Ruiz v. Barnhart*, No. 01 Civ. 1120, 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence).

Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).   The court must afford the Commissioner's determination considerable deference and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review."  *Valente v. Secretary of Health and Human Services*, 733 F.2d 1037, 1041 (2d Cir. 1984); *Dunston v. Commissioner of Social Security,* No. 14 Civ. 3859, 2015 WL 54169, at *4 (S.D.N.Y. Jan. 5, 2015) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)), *R. & R. adopted*, 2015 WL 1514837 (S.D.N.Y. April 2, 2015). Accordingly, if a court finds that there is substantial evidence supporting the Commissioner's decision, the court must uphold the decision, even if there is also substantial evidence for the plaintiff's position.  *Genier v. Astrue*, 606 F.3d 46, 49 (2d. Cir. 2010).  The court, however, will not defer to the Commissioner's determination if it

is "the product of legal error." *Dunston*, 2015 WL 54169, at *4 (citing, *inter alia*, *Douglass*, 496 F. App'x at 156; *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)).

**B.    Legal Principles Applicable to Social Security Determinations**

Under the Social Security Act, every individual considered to have a "disability" is entitled to disability insurance benefits.   42 U.S.C. § 423(a)(1).   The Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A).   A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."   42 U.S.C. § 423(d)(2)(A).

To determine whether an individual is disabled entitling them to benefits, the Commissioner conducts a five-step inquiry.   20 C.F.R. § 404.1520.   First, the Commissioner must determine whether the claimant is currently engaged in any substantial gainful activity.   20 C.F.R. § 404.1520(a)(4)(i).   Second, if the claimant is not gainfully engaged in any activity, the Commissioner must determine whether the claimant has a "severe impairment" that significantly limits the claimant's ability to do basic work activities.   20 C.F.R. § 404.1520(a)(4)(ii).   Under the applicable regulations, an impairment or combination of impairments that significantly limits the claimant's ability to perform basic work activities is considered "severe."   20 C.F.R. § 404.1520(c). Third, if the claimant has a severe impairment, the Commissioner must determine whether the impairment is, or medically equals, one of those included in the "Listings" of

16

the regulations contained at 20 C.F.R. Part 404, Subpart P, Appendix 1.  If it is, the Commissioner will presume the claimant to be disabled, and the claimant will be eligible for benefits.  20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not meet the criteria for being presumed disabled, then the Commissioner must next assess the claimant's RFC – that is, the claimant's ability to perform physical and mental work activities on a sustained basis despite his or her impairments, 20 C.F.R. § 404.1520(e) – and determine whether the claimant possesses the RFC to perform the claimant's past work.  20 C.F.R. § 404.1520(a)(4)(iv).  Fifth and finally, if the claimant is not capable of performing prior work, the Commissioner must determine whether the claimant is capable of performing other available work.   20 C.F.R. § 404.1520(a)(4)(v).  The claimant bears the burden of proof at the first four steps.  *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013).  Once the claimant has established that they are unable to perform their past work, however, the Commissioner bears the burden of showing that "there is other gainful work in the national economy which the claimant could perform."  *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (quoting *Carroll v. Secretary of Health and Human Services*, 705 F.2d 638, 642 (2d Cir. 1983)).

## Discussion

In moving for judgment in his favor, Schweers argues that the ALJ erred in five respects:  namely, by (1) failing to allow into the record the additional medical evidence about which Schweers informed the ALJ in advance of the hearing; (2) making contradictory findings regarding the severity of Schweers' mental impairments; (3) failing to properly consider the side effects of Schweers' medication; (4) failing to

properly determine Schweers' RFC and apply the Medical-Vocational Guidelines (known as the "Grids"); and (5) failing to properly evaluate Schweers' subjective complaints about his symptoms.  The Court agrees that the ALJ erred in failing to allow additional medical evidence into the record.  The Court starts, however, with an error not raised by Schweers but which nevertheless requires remand:  the ALJ's failure to develop the record by obtaining a medical source statement from Schweers' treating psychiatrist, Dr. Isaacs.

## A.    The ALJ's Failure to Sufficiently Develop the Record

"Before determining whether the Commissioner's conclusions are supported by substantial evidence," a court "must first be satisfied that the claimant has had a full hearing under the . . . regulations and in accordance with the beneficent purposes of the [Social Security] Act." *Moran*, 569 F.3d at 112 (quoting *Cruz v. Sullivan*, 912 F.2d 8, 11 (2d Cir. 1990)) (alterations in original).  "Even when a claimant is represented by counsel, it is the well-established rule in [the Second] [C]ircuit 'that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding.'" *Id.* (quoting *Lamay v. Commissioner of Social Security*, 562 F.3d 503, 508-09 (2d Cir. 2009)) (third alteration in original); *see also Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996) ("Because a hearing on disability benefits is a non-adversarial proceeding, the ALJ generally has an affirmative obligation to develop the administrative record.").  A critical aspect of the duty to develop the record implicated here is the duty to obtain medical source statements.

A medical source statement is an evaluation from a treating physician or consultative examiner of "what an individual can still do despite a severe impairment(s), in particular about an individual's physical or mental abilities to perform work-related activities on a sustained basis." *Hooper v. Colvin*, 199 F. Supp. 3d 796, 812 (S.D.N.Y. 2016) (quoting SSR 96-5p, 1996 WL 374183, at *4 (July 2, 1996)).  The opinion of a treating source ordinarily is given controlling weight, provided the opinion as to the nature and severity of an impairment "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2).  The regulations define a treating source as the claimant's "own physician, psychologist, or other acceptable medical source who provides [the claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]."  20 C.F.R. § 404.1527(a)(2).  Deference to such medical providers is appropriate because they "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations."[6]  20 C.F.R. § 404.1527(c)(2).

"In light of the special evidentiary weight given to the opinion of the treating physician . . . the ALJ must 'make every reasonable effort to obtain not merely the medical records of the treating physician but also a report that sets forth the opinion of the treating physician as to the existence, the nature, and the severity of the claimed

---

[6] The regulations for evaluating medical opinions have been amended but are applicable only to claims filed on or after March 27, 2017.  *See* 20 C.F.R. §§ 404.1527, 404.1520c; *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5844, *5867-68 (Jan. 18, 2017).

disability.'" *Hooper*, 199 F. Supp. 3d at 812 (quoting *Molina v. Barnhart*, No. 04 Civ. 3201, 2005 WL 2035959, at *6 (S.D.N.Y. Aug. 17, 2005)) (alteration in original); *see also* 20 C.F.R. § 404.1512(b)(1).  "Every reasonable effort" means that the ALJ "will make an initial request for evidence" from the claimant's medical source, and also a follow-up request "at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received" and the medical evidence is "necessary to make a determination."  20 C.F.R. § 404.1512(b)(1)(i).

An ALJ's failure to request medical source opinions from a treating physician is not a per se basis for remand where "the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity."  *Tankisi v. Commissioner of Social Security*, 521 F. App'x 29, 34 (2d Cir. 2013) (summary order). The need for a medical source statement from the treating physician hinges "on circumstances of the particular case, the comprehensiveness of the administrative record, and, at core, whether an ALJ could reach an informed decision based on the record."  *Sanchez v. Colvin*, No. 13 Civ. 6303, 2015 WL 736102, at *5 (S.D.N.Y. Feb. 20, 2015) (citing *Tankisi*, 521 F. App'x at 33-34); *see also Monroe v. Commissioner*, 676 F. App'x 5, 8-9 (2d Cir. 2017) (summary order) (reaffirming principle that a medical source statement or formal medical opinion is not necessarily required where the record contains sufficient evidence from which an ALJ can assess the claimant's residual functional capacity); *Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (summary order) (ALJ had no obligation to obtain medical source statement from treating physician where ALJ's decision was largely supported by consultative physician's

opinion, and the record contained all treatment notes from claimant's treating physicians).

Accordingly, "[c]ourts have distinguished *Tankisi* and remanded where the medical record available to the ALJ is not 'robust' enough to obviate the need for a treating physician's opinion." *Hooper*, 199 F. Supp. 3d at 815 (quoting *Sanchez*, 2015 WL at 736102, at *7); *see also Guillen v. Berryhill*, 697 F. App'x 107, 108-09 (2d Cir. 2017) (summary order) (remanding case where "[t]he medical records discuss[ed] [claimant's] illnesses and suggest[ed] treatment for them, but offer[ed] no insight into how her impairments affect or do not affect her ability to work, or her ability to undertake her activities of daily life"). This requirement applies even where the ALJ has access to treatment notes, test results, and other medical history. *See Siegmund v. Colvin*, 190 F. Supp. 3d 301, 309 (E.D.N.Y. 2016) (remanding where nothing in the administrative record showed that the ALJ made reasonable efforts to obtain reports detailing the opinion of the treating physician as to claimant's RFC); *Santiago v. Commissioner of Social Security*, No. 13 Civ. 3951, 2014 WL 3819304, at *17 (S.D.N.Y. Aug. 4, 2014) ("The ALJ must make reasonable efforts to obtain a report prepared by a claimant's treating physician even when the treating physician's underlying records have been produced.").

The importance of the treating physician takes on added importance in the context, as here, of mental health conditions; because a "mental health patient may have good days and bad days . . . the longitudinal relationship between a mental health patient and [his] treating physician provides the physician with a rich and nuanced understanding of the patient's health that cannot be readily achieved by a single

consultative examination." *Bodden v. Colvin*, No. 14 Civ. 8731, 2015 WL 8757129, at *9 (S.D.N.Y. Dec. 14, 2015); *see also Petrie v. Astrue*, 412 F. App'x 401, 405 (2d Cir. 2011) (summary order) ("The opinion of a treating physician is accorded extra weight because the continuity of treatment he provides and the doctor/patient relationship he develops place him in a unique position to make a complete and accurate diagnosis of his patient.") (internal quotation marks and citation omitted); *Sanchez*, 2015 WL 736102, at *7-9 (remanding and noting the necessity of obtaining treating physician's opinion where plaintiff suffers from long-term mental disorder because the "gravity and impact var[ies] by individual").

Despite the importance of a treating physician's opinion and particularly so in the context of mental health impairments, the ALJ here did not obtain, and did not attempt to obtain, a medical source statement from Schweers' treating psychiatrist Dr. Isaacs. This lapse was material, and prejudicial, for several reasons. The ALJ was fully aware that Dr. Isaacs was Schweers' treating psychiatrist and recognized him as such. (R. 17-18.) But at the same time, the ALJ gave little weight to Dr. Isaacs' opinion that Schweers was unable to work, faulting it as conclusory and a matter reserved to the Commissioner and unsupported by evidence in the record or Dr. Isaacs' treatment notes. (R. 18-19.) As the ALJ characterized it, Dr. Isaacs' opinion was "entitled to no particular significance." (R. 19.)

The ALJ's reasoning is problematic because he never gave Dr. Isaacs the opportunity to submit a relevant medical source statement. First, the note indicating that Schweers was unable to work is from October 2014 (R. 590), several months prior to the claimed onset of Schweers' disability. The ALJ readily could have sought a medical

source statement from Dr. Isaacs for the relevant time period.   Second, medical source statements typically address capabilities and limitations with respect to particular functional categories, whereas the ultimate decision of disability is a determination for the Commissioner, as the ALJ correctly noted.  (R. 19.)  The "unable to work" note in Dr. Isaacs' treatment records does not purport to be a medical source statement of the type most relevant to proceedings for disability insurance benefits.  The ALJ essentially set up a straw man by seizing upon and knocking down an opinion that was never intended to be a proper medical source evaluation.  Again, the ALJ readily could and should have sought a proper medical source statement from Dr. Isaacs.[7]

The ALJ compounded his failure to obtain a medical source opinion from Dr. Isaacs by failing to follow up on a curious cut-off of Dr. Isaacs' records.  Dr. Isaacs' treatment notes in the record end on June 22, 2015 (R. 546), three months into the relevant time period.   But there is no testimony or other evidence that Schweers stopped seeing Dr. Issacs at that time.   And there is no indication that the ALJ made

---

[7] The ALJ's reasoning also is also suspect given how conclusory it is.  "When the ALJ discredits the opinion of a treating physician, the ALJ must follow a structured evaluative procedure and explain his decision."  *Bodden*, 2015 WL 8757129, at *11 (citing *Rolon v. Commissioner of Social Security*, 994 F. Supp. 2d 496, 506 (S.D.N.Y 2014)).  The ALJ must consider:  (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the evidence that supports the treating physician's report; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician in contrast to the condition being treated; and (6) any other significant factors.  20 C.F.R. § 416.927(c)(2)–(6); *Selian*, 708 F.3d at 418 (holding that "to override the opinion of a treating physician . . . the ALJ must explicitly consider" these factors).  "This process must be transparent:  the regulations state that the Commissioner 'will always give good reasons in our notice of determination or decision for the weight we will give your treating source's opinion.'"  *Bodden*, 2015 WL 8757129, at 10; *accord* 20 C.F.R. § 416.927(c)(2).  Here, the ALJ's explanation of his discounting of Dr. Isaac's opinion does not address at all factors 1, 2, or 5.  And while the ALJ does mention inconsistency of the opinion with Dr. Isaacs' own treatment notes and "other evidence in the record," he does so summarily without specific reference to any particular note or record evidence.  (R. 19.)

any effort to follow up to inquire whether there were any additional records for the period of July 2015 through December 2016. The missing records are all the more salient in light of the ALJ's having summarily faulted Dr. Isaacs' opinion as being inconsistent with his own treatment notes. (R. 19.)

An ALJ must "investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 111 (2000). "Specifically, under the applicable regulations, the ALJ is required to develop a claimant's complete medical history." *Craig v. Commissioner of Social Security*, 218 F. Supp. 3d 249, 261 (S.D.N.Y. 2016) (citing *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996)). "This responsibility 'encompasses . . . the duty to obtain a claimant's medical records and reports.'" *Id.* (quoting *Pena v. Astrue*, No. 07 Civ. 11099, 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008)); *see* 42 U.S.C. § 423(d)(5)(B) ("In making any determination the Commissioner of Social Security shall make every reasonable effort to obtain from the individual's treating physician (or other treating health care provider) all medical evidence, including diagnostic tests, necessary in order to properly make such determination, prior to evaluating medical evidence obtained from any other source on a consultative basis.").

Courts routinely hold that an ALJ has a heightened duty to develop the record in case of psychiatric impairments due to the difficulties associated with evaluating a mental illness' impact on a claimant's ability to function adequately in a workplace. *See, e.g.*, *Estrella v. Commissioner of Social Security*, No. 12 Civ. 6134, 2016 WL 5920128, at *3 (S.D.N.Y. Oct. 7, 2016); *Santiago*, 2014 WL 3819304, at *15. That principle squarely applies here. As the Commissioner's regulations caution:

> Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or

> prolonged outpatient care with supportive therapy and medication.  For instance, if you have chronic organic, psychotic, and affective disorders, you may commonly have your life structured in such a way as to minimize your stress and reduce your symptoms and signs.  In such a case, you may be much more impaired for work than your symptoms and signs would indicate.  The results of a single examination may not adequately describe your sustained ability to function.  It is, therefore, vital that we review all pertinent information relative to your condition, especially at times of increased stress.

20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.00(E).  Courts thus "should exercise an extra measure of caution when adjudicating the claims of a litigant whose mental capacity is in question."  *Chapman v. ChoiceCare Long Island Term Disability Plan*, 288 F.3d 506, 514 (2d Cir. 2002).

Beyond the significance in failing to obtain a treating medical source opinion and fully develop the record where mental health impairments are at issue, the ALJ's failure to do so here had all the more import given his reliance on opinions provided by consultative doctors who had little to no familiarity with Schweers.  While assigning Dr. Isaacs little weight, the ALJ placed significant weight on one consulting mental health professional who examined Schweers only once and great weight on the consulting mental health professional who reviewed the record but never examined Schweers.  Neither consulting doctor had the "longitudinal" experience with Schweers that Dr. Isaacs did.

Given this material gap in the record, the Court cannot determine if the Commissioner's ultimate conclusion that Schweers was not disabled is supported by substantial evidence.  The case should be remanded so that the ALJ can attempt to obtain a medical source statement and any additional treatment notes from Dr. Isaac for the relevant period.

**B.     Errors Asserted by Schweers**

As noted earlier, Schweers raised several other alleged bases for finding error: (1) excluding additional medical evidence proffered before the hearing; (2) making contradictory findings; (3) failing to properly consider medicinal side effects; (4) failing to properly determine Schweers' RFC and correctly apply the Grids; and (5) failing to appropriately credit Schweers' subjective complaints about his symptoms.  The Court will briefly address each of these contentions in turn.

**1.     Exclusion of Additional Medical Evidence**

The Court agrees that the ALJ erred by excluding additional medical records. The regulations require an ALJ to consider evidence that the claimant either submits – or informs the ALJ about – no later than five business days before the date of the scheduled hearing.   20 C.F.R. § 404.935(a).   On September 18 (and 19), 2017, Schweers informed the ALJ that additional evidence from the Montefiore Medical Group had been requested but not yet received.  (R. 506, 510.)  Schweers therefore asked the ALJ to allow evidence to be submitted up to 30 days after the hearing.  (R. 506, 510.) The hearing was held on Tuesday, September 26, 2017, eight calendar days after Monday, September 18, 2017.  Taking account of the weekend of September 23-24, 2017, Schweers informed the ALJ of the additional records six business days before the hearing.[8]   At the hearing, before any testimony was taken, the ALJ and Schweers' counsel had an exchange regarding the outstanding records in which counsel stated that they had advised the ALJ of the outstanding records in light of the five day rule but

---

[8] The Court takes judicial notice that there were no national holidays during those six business days.  Even if there had been one holiday, Schweers still would have met the five business day requirement.

that counsel "[was] able to obtain those records from Montefiore."  (R. 65.)  The ALJ

then confirmed that that there was "nothing pending." (R. 65.)

Against this sequence of events, the ALJ's discussion of the additional records in

his written decision is baffling.  The ALJ's analysis, in relevant part, reads:

> The claimant submitted or informed me about additional
> written evidence less than five business days before the
> scheduled hearing date.  I decline to admit this evidence
> because the requirements of 20 CFR 416.1435(b) are not
> met.   The claimant's representative informed me of
> additional records from Montefiore on September 18, 2017,
> but he did not explain the need for these records or what
> they were expected to show.[9]

(R. 11.)   This passage makes a number of errors.   First, the ALJ was incorrect that

Schweers had not informed him of the additional records at least five days prior to the

hearing.  Second, although using virtually identical language, the regulatory provision cited

by the ALJ pertains to applications for supplemental social security income, not disability

insurance benefits.   Third, Schweers did explain the need for the records, in both the

September 18, 2017 submission and that of September 19, 2017.  (R. 506, 510.)

Despite those errors, however, the Commissioner argues "no harm, no foul,"

because the ALJ did admit records from Montefiore Medical Group and considered and

discussed them in his decision, while any additional records were cumulative or outside the

relevant time period.  (Dkt. 21, Memorandum of Law in Opposition to Plaintiff's Motion for

---

[9] The ALJ also stated that "outstanding records from Dr. Isaacs" were not admitted
because the claimant had not even informed him of the records prior to the hearing.  (R.
11.)  The ALJ's decision, however, references treatment records of Dr. Isaacs.  (R. 19.)
It is unclear whether the treatment notes in the record are the "outstanding records of
Dr. Isaacs" that the ALJ declined to admit or whether the "outstanding records" refer to
some other, additional records of Dr. Isaacs that are not in the record.  To the extent
there are any such outstanding records, the ALJ's duty to develop the record required
him to try to obtain – and admit – them along with a medical source statement from Dr.
Isaacs as discussed above.

Judgment on the Pleadings and in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings ("Def. Mem."), at 13.)   The Commissioner is partially correct. The record shows that medical records from Montefiore from June 15-August 5, 2015, and June 6-30, 2016, were admitted (as Exhibits B5F and B7F).   (R. 559-72, 574-603.)   In contrast, the Monefiore records appearing in the record but not admitted by the ALJ date from as early as November 4, 2016, to January 19, 2019.  (R. 67-343)  The Commissioner contends the additional records are either outside the relevant time period or merely "consistent with and cumulative of" the admitted records.  (Def. Mem. at 13-14.)

The Court agrees that many of the records are outside the relevant time period.  But not all.  The November 2016 records are from an emergency room visit after Schweers "had a panic attack and hit his left rib on the doorway and fell," fracturing two of his ribs.  (R. 178-81, 342.)  Although only a single event, it is a dramatic one that further reflects on Schweers' mental health status.  That he had had panic attacks previously hardly makes this incident merely "cumulative."  And the impact of its exclusion is only magnified by the ALJ's failure to fully develop the record and to secure a medical source statement from Dr. Isaacs.

Moreover, records from outside the relevant time period may be relevant – so long as they "shed light on" Schweers' condition during the relevant period.  *Clark v. Saul*, 444 F. Supp. 3d 607, 621 (S.D.N.Y. 2020).   "As case law notes, it sometimes happens that a claimant 'might . . . satisf[y] his burden of demonstrating that he was continuously disabled . . . by means of evidence only from before and after [the relevant] period.'"  *Id.* (quoting *Arnone v. Bowen*, 882 F.2d 34, 39 (2d Cir. 1989)).

The ALJ should have admitted and considered at the additional 2016 records for his decision and should do so on remand.  The ALJ also should consider medical records

outside the relevant time period to the extent they shed light on Schweers' history and condition during the relevant time period.

### 2.    Contradictory Findings

Schweers argues that the ALJ made internally contradictory findings by determining certain impairments to be severe (at step two) yet at the same time deeming those impairments resulted in only mild or no limitations.  (Pl. Mem. at 8-9.) Specifically, Schweers points to the ALJ having found Schweers' migraines, affective disorder, and anxiety disorder to be severe impairments but also having concluded that Schweers' mental impairments resulted in only mild limitation in the ability to understand, remember, or apply information, and no limitation in the ability to concentrate, persist, or maintain pace.  (*Id.* (citing R. 14-15).)

Schweers posits that what the ALJ considered to be severe "should not, in fact, be severe" (Pl. Mem. at 9), whereas the Commissioner asserts that the ALJ properly found that Schweers' mental health impairments "were severe" (Def. Mem. at 15).  In another curious aspect of this case, the parties thus assert positions that normally would be expected to be made by their adversary.  Perhaps Schweers means to argue that the ALJ erred in concluding that severe impairments caused only mild or no limitations. Even then, however, the Commissioner correctly explains that there is no inherent contradiction as the ALJ found mild or no limitation for only two of the four functional areas that an ALJ must consider in evaluating mental health impairments while finding moderate limitations for the two other functional areas.    *See* 20 C.F.R. § 404.1520a(c)(3) ("We have identified four broad functional areas in which we will rate the degree of your functional limitation:  Understand, remember, or apply information;

interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself.").

Indeed, the regulations provide that "[i]f we rate the degrees of your limitation as 'none' or 'mild,' we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1). The ALJ found exactly that: Schweers' impairments "significantly limit" his ability to perform basic work activities. (R. 14.) Accordingly, the Court finds no error in the ALJ's severity findings. On remand, however, the ALJ shall reconsider his severity findings in light of any new relevant information added to the record.

### 3.      Side Effects from Medicine

Schweers contends that the ALJ "failed to consider the side effects of Plaintiff's medication used to treat his recluse spider bite" as required by Social Security Ruling 96-7p. (Pl. Mem. at 9.) Not so. The ALJ's decision expressly considered that Schweers claimed he could not work due to symptoms "and medication side effects related to depression, anxiety, including sleeplessness, insomnia, fatigue, short-term memory problems, and panic attacks" as well as "blurry vision and weight gain." (R. 16.)

Schweers nevertheless faults the ALJ for not explicitly commenting on every aspect of medicinal side effects or effectiveness, such as "the calming effect of Xanax would have . . . on Plaintiff's ability to work. (Pl. Mem. at 12.) An ALJ, however, is not required to expressly comment on every aspect of a drug's side effects or effectiveness as long as it can be gleaned from the record that he considered them. *Colbert v.*

*Commissioner of Social Security*, 313 F. Supp. 3d 562, 580 (S.D.N.Y. 2018) ("The ALJ is not required to explicitly address each and every statement made in the record that might implicate his evaluation of the claimant's credibility as long as 'the evidence of record permits us to glean the rationale of an ALJ's decision.'") (quoting *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013) (summary order)).   While that is so here, the ALJ will need to revisit this issue in light of any new information received in further developing the record on remand.

### 4.    RFC Determination and Misapplication of Vocational Guidelines

According to Schweers, the ALJ erred in determining Schweers' RFC.   (Pl. Mem. at 9-10.)   Because the case will be remanded for further development of the record, which will necessarily affect the RFC determination and application of the Grids, the Court will not address this issue.   *See Vecchitto v. Saul*, No. 3:19-00726, 2020 WL 4696791, at *10 (D. Conn. Aug. 13, 2020) ("In light of the Court's holdings [remanding for failure to develop record], it need not reach the merits of the Plaintiff's other arguments."); *Jackson v. Colvin*, No. 13 Civ. 5655, 2014 WL 4695080, at *21 (S.D.N.Y. Sept. 3, 2014) ("Given that the Court recommends remand for further development of the record, the Commissioner will be required to reassess both [plaintiff's] credibility and [his] RFC in light of the new evidence."); *Rivera v. Commissioner of Social Security*, 728 F. Supp. 2d 297, 331 (S.D.N.Y. 2010) ("Because I find legal error requiring remand, I need not consider whether the ALJ's decision was otherwise supported by substantial evidence.").

**5.      Schweers' Subjective Complaints**

Finally, Schweers challenges the ALJ's assessment of Schweers' subjective complaints about his symptoms.  (Pl. Mem. at 10-12.)  Schweers asserts that the ALJ did not account for Schweers' testimony that he spends most of his day watching TV, that trying to read a newspaper gives him a headache, the intensity of his headaches, and his being "ill all the time" due to immunity to antibiotics caused by his spider bite.[10] (*Id.* at 11-12 (quoting R. 51).)  The ALJ did, however, expressly address Schweers' activities of daily living (R. 17-18), Schweers' headaches (R. 16-17), and many other of his claimed symptoms (R. 16-18).  There is no need for the ALJ to explicitly recite every particular so long as it is evident, as it mostly is here, that he considered all symptoms in following the two-step process prescribed by the regulations.  *Colbert*, 313 F. Supp. 3d at 580*; see generally* 20 C.F.R. § 404.1529 (setting forth the two-step symptom evaluation process).

It is not apparent from the record, however, that the ALJ considered Schweers' antibiotic immunity and susceptibility to illness.  On remand, the ALJ should do so.  And because the ALJ must further develop the record, he will need to reassess Schweers' credibility in light of any new relevant information.  *Wilson v. Colvin*, 107 F. Supp. 3d 387, 407 n.34 (S.D.N.Y. 2015) (since the ALJ failed to develop the record, the Commissioner must "necessarily" reassess a claimant's RFC and credibility on remand); *see also Jackson*, 2014 WL 4695080, at *21 (same).

---

[10] Schweers also reiterates his argument that the ALJ did not properly take account of the side effects from Schweers' medication.  That argument already has been addressed above.

## Conclusion

For the reasons stated above, pursuant to sentence four of 42 U.S.C. § 405(g), Plaintiff's motion is granted, the Commissioner's motion is denied, and this case shall be REMANDED for further consideration by the Commissioner consistent with this decision.

SO ORDERED.

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated:  September 14, 2020
         New York, New York

Copies transmitted this date to all counsel of record.